IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

|                              | Ⅹ |                              |
| ---------------------------- | - | ---------------------------- |
| UNITED STATES OF AMERICA,    | Ⅹ |                              |
|                              | Ⅹ |                              |
| Plaintiff,                   | Ⅹ |                              |
|                              | Ⅹ | Cv. No. 03-2952-Ml/V         |
| vs.                          | Ⅹ | Cr. No. 99-20244-01-(G)D     |
|                              | Ⅹ |                              |
| CALVIN BOYD,                 | Ⅹ |                              |
|                              | Ⅹ |                              |
| Defendant.                   | Ⅹ |                              |
|                              | Ⅹ |                              |

---

ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2255
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

---

On December 18, 2003, Defendant Calvin Boyd, Bureau of Prisons inmate registration number 17085-076, who is currently an inmate at the United States Penitentiary-Hazelton in Bruceton Mills, West Virginia, filed a pro se motion pursuant to 28 U.S.C. § 2255. (Docket Entry ("D.E.") 1.) The case, which was originally assigned to District Judge Bernice B. Donald, was transferred to this judge on February 5, 2004. The Court issued an order on October 12, 2004 directing the Government to respond to the motion. The Government filed its response to the motion on December 13, 2004. (D.E. 7.) Boyd filed a reply, entitled "Movant's Traverse to Government's Response to Motion Filed Pursuant to Title 28, U.S.C. § 2255 Petition" (D.E. 10), on January 3, 2005. The Government filed a sur-reply, entitled "Government's Reply to Defendant's

Transverse [sic] to Government's Response to Motion Filed Pursuant to Title 28. [sic] U.S.C. § 2255" (D.E. 13), on April 7, 2005.[1]

On October 20, 1999, a federal grand jury returned a five-count indictment against Boyd and four codefendants, Marcus Boyd, Carlos Wardlow, Steve Skinner, and Michael Brown. The grand jury returned a superseding indictment against these defendants on January 20, 2000. The first count charged all defendants with conspiring with each other and with other persons, including Omar Stokes and Sid Towns, to possess cocaine and cocaine base with the intent to distribute and to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 846. The second count charged all defendants with conspiring with each other and with other persons to possess in excess of one hundred (100) kilograms of marijuana with the intent to distribute and to distribute in excess of one

---

[1]    On July 25, 2005, Boyd filed a document, entitled "Memorandum of Facts and Law in Support of Calvin Boyd's §§ 2255 Motion to Vacate, Set Aside or Correct Sentence" (D.E. 15), which presents additional issues not included in his original motion. On December 7, 2005, the Government filed a response (D.E. 18), consisting of a motion to strike Boyd's filing "for failure to seek permission from the district court to amend his petition, and/or failure [to] seek permission from the court of appeals to file a second or successive petition." Motion and Memorandum to Dismiss to Strike from Record, filed Dec. 7, 2005, at 1-2. In the alternative, the Government asked the Court to construe Boyd's filing as a motion for leave to amend and, as so construed, to deny the motion. Boyd filed a response to the Government's motion on January 23, 2006. (D.E. 19.) In a separate order issued on November 7, 2005, the Court construed the July 25, 2005 motion as one seeking leave to amend and, as so construed, denied the motion. (D.E. 20.)

On January 3, 2005, Boyd filed a motion, pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts ("Section 2255 Rules"), seeking discovery in aid of his § 2255 motion. (D.E. 9.) The Government filed a response in opposition to the motion on January 18, 2005. (D.E. 12.) On May 9, 2005, Boyd filed a motion, entitled "Motion for Extention [sic] (Enlargement) of Time" (D.E. 14), seeking time to file a reply "and comply with the court's request for written interrogatories." In a separate order issued on November 7, 2006, the Court denied Defendant's motions. (D.E. 21.)

hundred (100) kilograms of marijuana, in violation of 21 U.S.C. §
846. The third count charged Boyd and three codefendants, Marcus
Boyd, Carlos Wardlow, and Michael Brown, with possessing, carrying,
using, brandishing, and discharging a firearm during the drug-
trafficking crime alleged in count 1, in violation of 18 U.S.C. §§
924(c) and 2. The fourth count charged Boyd and three codefendants,
Marcus Boyd, Carlos Wardlow, and Michael Brown, with murdering Omar
Stokes with a firearm during and in the course of the offense
alleged in count 3, in violation of 18 U.S.C. §§ 924(j) and 2. The
fifth count charged Boyd and three codefendants, Marcus Boyd,
Carlos Wardlow, and Michael Brown, with murdering Sid Towns with a
firearm during and in the course of the offense alleged in count 3,
in violation of 18 U.S.C. §§ 924(j) and 2.

The case with respect to Calvin Boyd proceeded to trial
on October 10, 2000 before then-District Judge Julia Smith Gibbons.
At the close of the Government's case, Judge Gibbons directed a
verdict for Boyd with respect to count 2. 10/12/00 Tr. at 587-90.
On October 13, 2000 the jury returned a verdict of guilty on counts
1, 3, 4, and 5 of the superseding indictment. Boyd filed motions
for a new trial on November 7, 2000 (Criminal Docket Entry ("Cr.
D.E.") 347) and November 20, 2000 (Cr. D.E. 354), and the
Government responded on January 10, 2001 (Cr. D.E. 374). Judge
Gibbons conducted a sentencing hearing on January 11, 2001, at
which time Boyd was sentenced to life imprisonment on counts 1, 4,

3

and 5, to run consecutive to a ten-year sentence imposed on count 3. Judge Gibbons also imposed a five-year period of supervised release. At the sentencing hearing, Judge Gibbons denied Boyd's motions for a new trial, and an order to that effect was issued on January 22, 2001. (Cr. D.E. 394.) Judgment was entered on January 29, 2001. The United State Court of Appeals for the Sixth Circuit affirmed. United States v. Brown, et al., 54 F. App'x 201 (6th Cir. Dec. 26, 2002).

The underlying facts of this case, as set forth in the opinion of the Sixth Circuit on direct appeal, are as follows:[2]

> On March 13, 1999, a Memphis police officer received a call of shots fired at the parking lot of a body shop in Memphis, Tennessee. The officer responded and found two persons dead at the scene, apparently having been shot several times. The officer was given a description to be on the lookout for two African-American men, one of whom might be dressed in black. The officer saw two persons at the scene who fit this description. When the officer approached them, they fled. The officer eventually caught one of the men, who was later identified as [Michael] Brown. The officer found a nine millimeter pistol on Brown. Ballistic tests determined that two firearms had been used in the shooting. Several bullets, bullet fragments, and shell casings recovered at the scene matched Brown's pistol. The victims were identified as Sid Towns and Omar Stokes.

> The evidence at trial showed that Towns and Stokes were killed because they lost money given to them by Marcus Boyd for a drug deal that they were to have completed in Houston. Texas. A summary of some of the witnesses' testimony follows.

---

[2]     Marcus Boyd, Calvin Boyd, and Michael Brown were tried separately, and their appeals were consolidated. The Sixth Circuit explained that, "[a]lthough the defendants were separately tried, substantially the same evidence was presented at each of the trials, except as specifically noted." United States v. Brown, et al., 54 F. App'x at 203.

4

Jackie Arnold, who pled guilty to a drug offense under a Rule 11 agreement and had prior felony convictions, testified that he was a source of marijuana for Marcus Boyd when he was a student at Tennessee State University. He testified that Marcus Boyd obtained 50 pounds of marijuana almost daily and that later the amount increased to 100 pounds several times a week. Arnold also testified that he supplied Marcus Boyd with cocaine and that Marcus Boyd would convert the cocaine to crack. Arnold estimated that he supplied Marcus Boyd with 2,000 pounds of marijuana and in excess of 50 kilograms of cocaine between September 1997 and September 1998. Arnold testified that his source of the drugs was an individual named Roderick Kelley. Arnold further testified that he supplied Marcus Boyd until Marcus Boyd began dealing directly with Kelley after September 1998.

Roderick Kelley, also a convicted felon who cooperated with the government, testified that he was the source for Arnold, and later for Marcus Boyd. Starting in September 1998, Kelley supplied Marcus Boyd with marijuana and cocaine. From September 1998 to December 1998, Kelley supplied Marcus Boyd with more than 20 kilograms of cocaine and several hundred pounds of marijuana. . . .

Tyrone Crane, who pled guilty to a drug offense under a Rule 11 agreement, testified that he worked with Marcus Boyd and Michael Brown to acquire and distribute marijuana and cocaine. He testified that he picked up marijuana with Marcus Boyd on several occasions and also picked up cocaine and was present when the cocaine was converted to crack. Crane also named Steve Skinner and Carlos Wardlow as involved in the same activities.

Franchesca Tyler, Towns' fiancee, testified that Marcus Boyd delivered $53,700.00 to Towns before Towns left for Houston.

Antonio Bogard testified that he traveled with Towns and Stokes to Houston but did not know the purpose of the trip. He also testified that when Towns lost the money, Bogard went back to Memphis.

Lanail Allen testified that he lives in Houston and is in the music industry. He testified that Stokes owed him $15,000.00 for producing two music tracks for him in 1999. He also testified that Stokes called him asking

5

where he could buy some cocaine. Allen told Stokes he
knew a buyer but did so only to get his money from
Stokes. He admitted to taking $51,000.00 from Stokes in
Houston.

Robert Taylor testified that he had stolen a white
Chrysler Sebring with another person and that Marcus Boyd
agreed to buy it from them. He also testified that Brown
was with Marcus Boyd when he bought the car. [3]

Jason Coleman was a student at Tennessee State
University and friend of Marcus Boyd. He testified at
Brown's and Marcus Boyd's trials. [4] Coleman apparently
drove the getaway car for the murderers but was not
charged in the case. He testified that while he was
sleeping, Marcus Boyd woke him up and told him to drop
Brown and Calvin Boyd off at the body shop, because he
was owed money by the victims. He testified that he did
not see the shootings but that all of the defendants were
present at the scene and that he fled the scene when he
heard the shooting. He also testified in Michael Brown's
trial that after he fled, he was picked up by Wardlow's
girlfriend and taken to Marcus Boyd's house [5] . . . .

    . . . .

Calvin Boyd also spoke to police after he was
arrested and given <u>Miranda</u> warnings. He eventually told
police about his role in the conspiracy and the murders.
He also said that he believed Stokes and Towns lost the
money given to them by Marcus Boyd in a drug deal in
Chicago and that Marcus Boyd recruited him to kill them
in retaliation for losing the money. Calvin Boyd prepared
two signed and typed statements implicating Brown and

---

[3]     Taylor also testified that Calvin Boyd may have been present.
10/11/00 Tr. at 409, 414-15.

[4]     Coleman also testified at Calvin Boyd's trial. 10/11/00 Tr. at 420.

[5]     At Calvin Boyd's trial, Coleman testified that, as he attempted to
flee the scene, Brown and Calvin Boyd jumped into the car. Before they had gone
far, the car stalled and Coleman fled, leaving the others behind. He eventually
arrived back at Marcus Boyd's house. 10/11/00 Tr. at 430-31; 10/12/00 Tr. at 456-
57, 472-75.

Marcus Boyd in the murders. Calvin Boyd's statements were admitted at trial.

United States v. Brown, et al., 54 Fed. Appx. at 203-05.[6]

In his original § 2255 motion, which was filed on December 18, 2003, Calvin Boyd asserted that he received ineffective assistance of counsel, in violation of the Sixth Amendment, due to the failure of his attorney adequately to develop the factual record during the suppression hearing and to file objections to the proposed findings of fact, proposed conclusions of law, and recommended disposition issued by the magistrate judge on August 31, 2000 in connection with his suppression motion.

On July 14, 2000, Calvin Boyd and Brown filed suppression motions.[7] On July 24, 2000, Judge Gibbons referred Calvin Boyd's suppression motion to Magistrate Judge James H. Allen for a report and recommendation. (Cr. D.E. 217.) The Government filed a response to Calvin Boyd's suppression motion on July 27, 2000. (Cr. D.E. 218.) Magistrate Judge Allen conducted a joint hearing on the suppression motions filed by Calvin Boyd and Brown on August 14, 2000; August 15, 2000; August 16, 2000; and August 17, 2000. Boyd did not testify on his own behalf at the suppression hearing. On

---

[6] The Court has omitted the testimony that was not introduced at Calvin Boyd's trial. In addition to the testimony quoted by the Sixth Circuit, a Memphis police officer testified that a search warrant for the house occupied by Calvin Boyd's grandfather, Jake Boyd, was executed later in the day on March 13, 1999, that Calvin Boyd was present, that .9 millimeter bullets were found in his front pants pocket, and that Calvin Boyd was taken into custody on suspicion of murder. 10/12/00 Tr. at 479-87 (testimony of Therman Richardson).

[7] Calvin Boyd's suppression motion is Cr. D.E. 213.

August 31, 2000, Magistrate Judge Allen issued proposed findings of fact and proposed conclusions of law denying the suppression motions filed by Calvin Boyd (Cr. D.E. 242) and Brown (Cr. D.E. 241).[8] Counsel for Calvin Boyd did not file timely written objections to the proposed findings and conclusions. On the first day of trial, counsel for Boyd sought leave to file objections to the report and recommendation,[9] which was denied on the record, 10/10/00 Tr. at 7-8. Judge Gibbons expressly adopted the report and recommendation. Id.; see also 10/12/00 Tr. at 615.

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

---

[8]     The order with respect to Brown contained factual findings relevant to Calvin Boyd that are not repeated in the order addressing Boyd's motion.

[9]     Counsel filed a written motion, Cr. D.E. 297.

To demonstrate deficient performance by counsel, a defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

<u>Id.</u> at 689 (citation omitted); <u>see also</u> <u>Coe v. Bell</u>, 161 F.3d 320, 342 (6th Cir. 1999) ("The specifics of what Coe claims an effective lawyer would have done for him are too voluminous to detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement."); <u>Adams v. Jago</u>, 703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been denied effective assistance by erroneous tactical decisions if, at the time, the decisions would have seemed reasonable to the competent trial attorney'").

9

A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. <u>Lewis v. Alexander</u>, 11 F.3d 1349, 1352 (6th Cir. 1993); <u>Isabel v. United States</u>, 980 F.2d 60, 64 (1st Cir. 1992). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." <u>Strickland</u>, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. <u>Id.</u> at 697.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> Additionally, however, in analyzing prejudice,

> the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

<u>Lockhart v. Fretwell</u>, 506 U.S. 364, 368 (1993) (citing <u>United States v. Cronic</u>, 466 U.S. 648, 658 (1984)); <u>see also</u> <u>Strickland</u>, 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). "Thus analysis

focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." <u>Lockhart</u>, 506 U.S. at 369.

At the suppression hearing, Boyd contended that he was arrested without probable cause and, therefore, that any statements made were "fruits" of this unlawful arrest; that he was not advised of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); and that any statements given by him to law enforcement officials were not voluntary. In his § 2255 motion, he has argued only that he was arrested without probable cause.

Boyd first asserts, incorrectly, that the report and recommendation did not address the issue of probable cause to arrest Boyd and Michael Brown. § 2255 Mot., Attachment Sheet 1; <u>see also</u> <u>id.</u>, Attachment Sheets 2-5 (emphasizing that the issue of probable cause to arrest was at issue in the suppression hearing). The report and recommendation made the following factual findings about the arrest of Boyd:

> On or about March 13, 1999, two men were killed in the vicinity of 2267 N. Lauderdale, Memphis, Tennessee, apparently as part of a drug transaction gone bad. Two male blacks were seen leaving the area, and one of these, Michael Brown (a co-defendant with defendant Calvin Boyd in this indictment) was captured, while the other (later identified as defendant Calvin Boyd) escaped. . . .
>
> On March 13, 1999, at 5:50 P.M., co-defendant Michael Brown gave a written statement to Sgt. W.L. Ashton and Lt. W. Norris, admitting his guilt in the double homicide, and naming "Calvin Kitchens (Rico)" as being one of the "shooters". Defendant Brown also told Sgt. Ashton that "Calvin Kitchens (Rico)" lived at 1718

11

Castex, in Memphis . . . . Sgt. Ashton checked around and learned that "Calvin Kitchens" was another name for defendant Calvin Boyd. Information was distributed that defendant Boyd, a/k/a "Kitchens", was wanted for questioning regarding his participation in the double murder.

Prior to this, and on March 10, 1999, a State search warrant was issued by the General Sessions Court Judicial Commissioner for 1718 Castex, Memphis, Tennessee, for cocaine, drug paraphernalia, etc., describing, as the one living there, a "M/B, approx. 65 years of age, approx. 5'4", approx. 260 lbs." (which turned out to be Jake Boyd, defendant Calvin Boyd's grandfather). As can be seen, this search warrant was issued by the Judicial Commissioner three (3) days before the homicide, and was thus not in any way related to the double homicide. On March 13, 1999, Memphis Homicide officers apparently learned of this outstanding search warrant, and, on that same date, in the late afternoon, met with the Shelby County Sheriff's Office Street Crimes Unit. The address at 1718 Castex was reported as being a "gang house." All officers who would be involved in the execution of this search warrant were advised of the double homicide, and were told that the suspect (defendant Calvin Boyd, a/k/a Calvin Kitchens) might be at that location. Homicide officers, including Sgt. James L. Fitzpatrick and Sgt. Hendricks, were with this group of officers. They were aware that (1) defendant Calvin Boyd had been implicated by co-defendant Michael Brown as a "shooter" in a double homicide; (2) co-defendant Michael Brown had said that defendant Boyd lived at 1718 Castex (the place where the search warrant was to be executed); (3) 1718 Castex was reported as being a "gang house"; (4) defendant Boyd had escaped that day from Patrolman Moultrie, and defendant Michael Brown had said he had a weapon at the time; and (5) co-defendant Michael Brown had said that the double homicide was set up because of the failure of the two victims to return from Texas either with the money given them or the narcotics to be bought. It is therefore quite understandable that all officers might be concerned as to what (and whom) they would find upon serving this search warrant.

The search warrant was executed on March 13, 1999, at about 8:30 P.M. . . . Found was a relatively small

quantity of marijuana and a .38 caliber pistol.[10] One of the individuals at that location was defendant Calvin Boyd, and he was arrested.

. . . .

Up to this point, there has been no proof offered to the contrary of the foregoing, and it is SUBMITTED that the above recitation of proof has been established by a clear preponderance, and greater weight, of the evidence.

Cr. D.E. 242 at 2-3, 5 (record citations omitted).

The report and recommendation also contained the following legal conclusions about the validity of the arrest:

As previously indicated herein, defendant Boyd was taken into custody on March 13, 1999, at 1718 Castex, during the execution of a search warrant. There is no contention that the search warrant was obtained as a subterfuge in order to arrest defendant Boyd, since it was obtained on March 10, 1999, well before the double homicide forming an important part of the indictment herein.

Defendant Boyd was inside 1718 Castex when this search warrant was executed in the late evening on March 13, 1999. A valid warrant to search for contraband, founded on probable cause, implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted. Michigan vs. Summers, 452 U.S. 692, 705 (1981). It is therefore SUBMITTED that it was proper to detain defendant Boyd while the search was being conducted.

It is SUBMITTED, however, that officers had independently ample probable cause to arrest defendant Boyd for homicide. They had the confession of co-defendant Brown implicating defendant Boyd (a/k/a "Kitchen") as a "shooter".

The test for the constitutionality of an arrest is whether, at the moment when the arrest was made, officers had probable cause to make it. Beck vs. Ohio, 379 U.S.

---

[10]     The pistol seized at 1718 Castex was not the murder weapon.

13

89, 91 (1964). Officers have probable cause to arrest when, at the moment of arrest, "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the . . (suspect). . had committed or was committing an offense." Beck, p. 91.

Therefore, since, as herein SUBMITTED, the arrest of defendant Boyd was constitutionally valid, it is SUBMITTED that any statements or admissions by defendant Boyd after this arrest should not be suppressed as being "fruits" of an invalid arrest.

Id. at 10-11. Thus, Boyd's suggestion that counsel rendered ineffective assistance by failing to object to the report and recommendation on the basis that it did not address the probable cause for his arrest is without merit.

Boyd expends considerable effort in challenging the probable cause for the arrest of his codefendant, Michael Brown. § 2255 Mot., Attachment Sheets 6-10. As Boyd lacks standing to challenge the probable cause for the arrest of Brown, Rakas v. Illinois, 439 U.S. 138 (1978) (passengers in automobile they did not own could not challenge search because their own Fourth Amendment rights were not violated); United States v. Padilla, 508 U.S. 77 (1993) (per curiam) (rule regarding standing to challenge constitutionality of search is not subject to "coconspirator exception"); United States v. Hopper, 58 F. App'x 619, 624-25 (6th Cir. 2003) (defendant could not challenge purportedly illegal traffic stop of his wife or her allegedly coerced consent to search

their house), it necessarily follows that his attorney did not render ineffective assistance by failing to challenge that arrest.

Boyd also asserts that Michael Brown's identification of the second shooter as "Calvin Kitchens" did not provide probable cause for his arrest, and he complains that the record does not adequately establish how the police concluded that "Calvin Kitchens (Rico)" was Calvin Verderico Boyd. § 2255 Mot., Attachment Sheets 14-15, 16-19. Boyd overlooks the facts that (i) Brown advised officers that "Kitchens" resided at 1718 Castex, a house occupied by Boyd's grandfather, Jake Boyd;[11] and (ii) the street name "Rico" is a shortened form of Boyd's middle name "Verderico." Boyd also ignores the testimony of Memphis Police Sergeant James L. Fitzpatrick, who explained the steps he took to discover the true identity of "Calvin Kitchens (Rico)":

> Early when the investigation—when the address of 1718 Castex had been given to Sergeant Ashton, and in that I was not involved in anything particular at that time, he asked me to check that location to see what I could come up with about any activity or contact with the police. And he told me that they were looking for a Calvin Kitchens, which name had been supplied by Mr. Brown ultimately. I checked 1718 Castex and I found two names, Ms. Brooks, I believe, and Calvin Boyd. So I checked to make sure what we had on Calvin Boyd, and it came back to 1718 Castex and indicated he had an arrest in December of 1998, and we felt that this person named Calvin Kitchens was one and the same, and the description and age were the same.

---

[11]     The presentence report lists Boyd's home address as 1718 Castex.

08/15/00 Tr. at 254-55; see also id. at 285 (Fitzpatrick's involvement in the case began "[o]nce we got the address of 1718 Castex and the name Calvin Kitchens, [Sergeant Ashton] came to me to see if I could locate any information to see if there was indeed such a person as Calvin Kitchens."}, 290. Sergeant Fitzpatrick had information concerning several locations frequented by Boyd, id. at 253, 258, and, as Boyd was not found at the other addresses, Fitzpatrick was instructed to wait outside while the warrant for 1718 Castex was executed, id. at 253, 256-60; see also 08/14/00 Tr. at 151-52 (testimony of Sergeant Ashton on the development of the three addresses on Boyd and the execution of the search warrant). Sergeant Lane of the Shelby County Sheriff's Office Street Crimes Unit, one of the officers who executed the search warrant, testified that Boyd was present and identified himself as "Calvin Boyd." 08/15/00 Tr. at 229-30. Sergeant Lane testified that he "advised him to stand up[,] that there were some homicide officers that needed to speak with him out front, and he was checked for weapons and then taken out front to the homicide detectives." Id. at 230. The evidence presented at the suppression hearing was more than sufficient to establish that, at the time he was taken into custody, police had probable cause to believe that Boyd was the individual implicated by Michael Brown notwithstanding Brown's use

16

of the name "Calvin Kitchens (Rico)."[12] After Boyd had been arrested, Brown identified a picture of Calvin Boyd as the person who participated in the murders with him, who he knew as "Calvin Kitchens" or "Rico." Id. at 203, 206-08, 220 (testimony of Sgt. Ashton).

---

[12]   Boyd relies on an ambiguous statement by Sergeant Ashton that "[i]t turned out that our dispatcher was the one that discovered [Boyd's real name] when he was making a phone call to try to verify the alibi that Mr. Boyd was giving to us." § 2255 Mot., Attachment Sheet 19 (quoting 08/14/00 Tr. at 174). Sergeant Ashton was the lead investigator on the case, 08/14/00 Tr. at 130 (testimony of Captain Donald Woody), 163, 174-75 (testimony of Sgt. Ashton), and he also took the statements from Michael Brown that also implicated "Calvin Kitchens (Rico)," id. at 147-48. Sergeant Ashton testified that, once Brown had identified his accomplice,

> I was in contact with the Attorney General's office with Mr. David Henry and I was in contact with the Shelby County Sheriff's Department, Inspector Mike McEachran, and we developed, I believe, it was three different addresses where Mr. Boyd could possibly be hiding. And I got the Sheriff's Department to help me secure the location and go out and see if they could locate him.

Id. at 151-52. It was clear on cross-examination that Sergeant Ashton did not recall precisely when and how the determination was made that Calvin Boyd was Brown's accomplice. See id. at 165, 174. In response to a question by the magistrate judge, he admitted that his only information on the subject comes from the written supplement. Id. at 174. The statement that the true identity of the accomplice was first discovered when telephone calls were made to check on Boyd's alibi cannot be correct, as those events did not occur until after Boyd was taken into custody. The testimony of Sergeant Fitzpatrick, and the testimony of Sergeant Ashton concerning his attempts to ascertain where Boyd might be found, indicate that, prior to the execution fo the search warrant, police had concluded that they were searching for Calvin Boyd.

     Boyd also relies on Ashton's very unclear reference to the "state case," id. at 174, as further support for his position that his attorney should have obtained all relevant records. § 2255 Mot., Attachment Sheet 19. The only potentially relevant documents that were not at the suppression hearing was the state court file on the application for a search warrant. Every other identifiable document referred to by a witness was accounted for. See, e.g., 08/14/00 Tr. at 19-24, 62, 63-66; 08/17/00 Tr. at 411. As the search warrant was obtained several days before the murders, and as the search warrant on its face refers only to Boyd's grandfather, there is no reason to believe the state court file would have any information about Calvin Boyd relevant to the suppression hearing. At the conclusion of the suppression hearing, Boyd's attorney represented that he expected to obtain the file on the search warrant imminently, and Magistrate Judge Allen invited him to file a supplement if any probative information was discovered. Id. at 410-11.

17

Next, Boyd points to the fact that Michael Brown's first formal statement was dated 8:10 p.m., around the time the search warrant for 1718 Castex was executed, and argues that there was no probable cause at the time of his arrest, presumably because the police would not have had enough time to ascertain that "Calvin Kitchens (Rico)" was Calvin Boyd. § 2255 Mot., Attachment Sheets 6, 10-14, 16-20. The testimony of the officers who questioned Brown and Boyd established that their procedure was to interview the subjects to ascertain their stories and then to memorialize those stories, to the extent possible, in written statements. See, e.g., 08/14/00 Tr. at 145, 154-55, 198 (testimony of Sgt. Ashton); 08/15/00 Tr. at 242-43, 244, 247-50 (testimony of Sgt. Fitzpatrick). The police questioning of Brown commenced at approximately 2:20 p.m. on March 13, 1999. 08/14/00 Tr. at 123, 130, 135-36 (testimony of Memphis Police Captain Donald Woody). At approximately 3:30 p.m., Sergeant Ashton was informed that Brown did not want to speak with Officers Woody and Hendricks and that Brown wanted to speak to him. Id. at 186-87, 189, 191-92 (testimony of Ashton); see also id. at 121-26 (Woody questioned Brown for 20-30 minutes before Ashton took over the questioning), 146-47, 186-90 (testimony of Sgt. Ashton). Shortly thereafter, Brown gave an oral statement implicating himself and "Calvin Kitchens." Id. at 147-49, 190-92, 193-98. At 5:47 p.m., Sergeant Ashton and another officer took a written statement from Brown. Id. at 193, 198-99. Brown

18

signed the statement at 8:10 p.m. Id. at 199. Sergeant Fitzpatrick testified that he was given the name "Calvin Kitchens (Rico)" some time during the afternoon of March 13, 1999, hours prior to the execution of his written statement. 08/15/00 Tr. at 261-62, 286, 288; see also id. at 254-55; 08/14/00 Tr. at 151-52 (Ashton's testimony of steps taken to confirm the identity of, and to locate, "Calvin Kitchens"). Ashton testified that he took breaks during the questioning of Brown. Id. at 193. Sergeant Ashton or the other officer must have left the interview room to ask Sergeant Fitzpatrick to find out what he could on "Calvin Kitchens (Rico)." See, e.g., id. at 276-77 (testimony of Sgt. Fitzpatrick concerning interview procedure), 305 (testimony of Sgt. Shemwell re same). This issue is without merit.

Boyd also complains that his attorney failed to challenge the probable cause for the search of his grandfather's house at 1718 Castex, where he was arrested. § 2255 Mot., Attachment Sheets 6, 16, 20-21; see also Movant's Traverse to Government's Response to Motion Filed Pursuant to Title 28, U.S.C. § 2255 Petition, filed Jan. 3, 2005 ("D. Reply Br."), at 5, 7-8. The search warrant for 1718 Castex was issued several days prior to the murders, see supra p. 13, and no physical evidence seized during that search was introduced at trial. The motion does not set forth any viable basis for a challenge to the search warrant, even assuming that Calvin

19

Boyd had standing to raise it.[13] Moreover, even if the Court were to conclude that there was no probable cause for issuance of a search warrant, the arrest of Calvin Boyd during the execution of that warrant would still be valid as there was independent probable cause for his arrest and the arresting officers had a good faith basis for believing that they entered the house pursuant to a search warrant. See United States v. Leon, 468 U.S. 897 (1984). This issue is without merit.

Finally, Boyd complains that his attorney rendered ineffective assistance by failing to file timely objections to the report and recommendation. § 2255 Mot., Attachment Sheets 1-2, 17, 21; D. Reply Br. at 8-9. Although counsel did not file written objections to the report and recommendation, he did, as previously noted, see supra p. 8, orally object at the start of trial, and Judge Gibbons denied his objection on the merits. Boyd has not established either deficient performance or prejudice with respect to this issue.

Boyd's conviction and sentence are valid, and his § 2255 motion is DENIED.

Consideration must also be given to issues that may occur if Defendant files a notice of appeal. Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability

---

[13]     As previously noted, see supra p. 15 & n.11, Boyd apparently lived at that address.

of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") only if "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also Fed. R. App. P. 22(b); Lyons v. Ohio Adult Parole Auth., 105 F.3d 1063, 1073 (6th Cir. 1997) (district judges may issue certificates of appealability under the AEDPA). No § 2255 movant may appeal without this certificate.

In Slack v. McDaniel, 529 U.S. 473, 483-84 (2000), the Supreme Court stated that § 2253 is a codification of the standard announced in Barefoot v. Estelle, 463 U.S. 880, 893 (1983), which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'" Slack, 529 U.S. at 484 (quoting Barefoot, 463 U.S. at 893 & n.4).

The Supreme Court has cautioned against undue limitations on the issuance of certificates of appealability:

> [O]ur opinion in Slack held that a COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application of a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in Slack would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "'has already failed in that endeavor.'"

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 337 (2003) (quoting <u>Barefoot</u>,

463 U.S. at 893). Thus,

> [a] prisoner seeking a COA must prove "'something more than the absence of frivolity'" or the existence of mere "good faith" on his or her part. . . . We do not require petitioners to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

<u>Id.</u> at 338 (quoting <u>Barefoot</u>, 463 U.S. at 893); <u>see also</u> <u>id.</u> at 342

(cautioning courts against conflating their analysis of the merits

with the decision of whether to issue a COA; "The question is the

debatability of the underlying constitutional claim, not the

resolution of that debate.").[14]

   In this case, for the reasons previously stated,

Defendant's claims are plainly lacking in substantive merit and,

therefore, he cannot present a question of some substance about

which reasonable jurists could differ. The Court therefore DENIES

a certificate of appealability.

   The Sixth Circuit has held that the Prison Litigation

Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to

appeals of orders denying § 2255 motions. <u>Kincade v. Sparkman</u>, 117

F.3d 949, 951 (6th Cir. 1997). Rather, to appeal <u>in forma pauperis</u>

---

[14]   By the same token, the Supreme Court also emphasized that "[o]ur holding should not be misconstrued as directing that a COA always must issue." <u>Id.</u> at 337. Instead, the COA requirement implements a system of "differential treatment of those appeals deserving of attention from those that plainly do not." <u>Id.</u>

in a § 2255 case, and thereby avoid the appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Fed. R. App. P. 24(a). Kincade, 117 F.3d at 952.[15] Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal in forma pauperis, the prisoner must file his motion to proceed in forma pauperis in the appellate court. See Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter is not taken in good faith, and leave to appeal in forma pauperis is DENIED. Accordingly, if Movant files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to

---

[15]     Effective April 9, 2006, the appellate filing fee increased from $255 to $455.

proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days.

IT IS SO ORDERED this 29 day of December, 2006.


s/Jon Phipps McCalla
UNITED STATES DISTRICT JUDGE

24